**Troy Shelton ASHLEY et al.,
Plaintiffs,**

v.

**The CITY OF MACON, GEORGIA, et al.,
Defendants.**

**Civ. A. No. 2928.**

United States District Court,
M. D. Georgia,
Macon Division.

Jan. 24, 1974.

Charles Marchman, Jr., Macon, Ga., for plaintiffs.

Lawton Miller, Jr., Miller & Miller, Macon, Ga., for defendants.

OWENS, District Judge:

Plaintiff police officers of the City of Macon, Georgia, desiring while on duty to wear their hair in whatever manner and fashion they choose to wear it and to grow sideburns, mustaches and beards when and as they wish to, contend in this civil action that they have a right under the Constitution of the United States to wear their hair, be it on their heads or their faces and necks, as they wish to, and further contend that even if they do not have such a constitutional right, rules, regulations and policies of the Macon Police Department requiring them at all times to not let their hair cover any part of their ears or their shirt collar and to refrain from having mustaches, beards, and long sideburns, are legally invalid.

Plaintiffs, in addition, assert that even if such rules, regulations and policies are legally valid, they are not applied uniformly to every police officer of the City of Macon since some police offi-

cers are women and as women are permitted to wear their hair over their ears and their shirt collars. This, they say, violates their rights under the Fourteenth Amendment to the equal protection of the law. An evidentiary hearing having been held and the contentions of the plaintiffs and defendants having been considered, this constitutes the court's findings of fact and conclusions of law.

An ordinance of the City of Macon pertaining to police officers has provided since 1947:

"Every officer when reporting for duty must be neat in his person, clean shaved, his clothes and shoes clean, and detectives excepted, his dress in conformity with the regulations." 1947 Code of Ordinances, Section 24–1016.

On November 9, 1971, Assistant Chief of Police J. E. Brooks promulgated written orders which included the following:

"TO: ALL SUPERIOR OFFICERS

"FROM: CHIEF J. E. BROOKS, ASSISTANT CHIEF OF POLICE

"All Superior Officers are to see that the following orders are carried out immediately. The orders coming from this Office are considered permanent orders, not temporary, as some of you seem to think.

"1) Officers, from Blue Coat right on up to Superior Officers, are to cease wearing mustaches, long hair, and porkchop sideburns. Chief Flynt and I shall expect to see all Officers wearing their hair in such a manner that when they are holding their head erect their hair is not touching their collar.

"2) Officers are to come to work with their uniform fresh looking, and not like they have been worn two or three days without being cleaned. And, they are to have their shoes shined.

"3) Officers are to wear their head gear whenever they are out of the Patrol Car." Defendant's Exhibit 1.

\* \* \* \* \* \*

According to Chief Brooks, every superior officer has the responsibility of enforcing these regulations as to the police officers under his command. (Transcript, p. 52). Chief Brooks also testified that these orders were issued to insure that police officers as a whole are neat looking, both from a uniform and a personal appearance standpoint. This regulation as interpreted by the police department and as enforced includes a prohibition against a police officer's hair covering his ears. (Transcript, pp. 57–58). It is uniformly enforced as to all male police officers; female officers may, however, wear their hair long and over their ears as women usually do. The uniform enforcement of this regulation is essential in Chief Brooks' opinion to the maintenance of a good state of discipline and order among the officers of the police department. (Transcript, pp. 61–67).

Of the named plaintiffs, one officer —Troy Ashley—when directed to comply with this regulation, refused to do so and now stands suspended for wilfully disobeying that order. The remainder of the plaintiffs, when told to do so, complied with the order and are still employed as police officers. They, however, would still like to receive the legal blessing of the United States Courts to disobey that regulation and order.

Is there a constitutional right to wear one's hair—head and facial—as one sees fit? Unlike those rights that are clearly set forth in the Constitution of the United States and its amendments —Freedom of Religion, of Speech and of the Press; Right to Keep and Bear Arms; Freedom from Quartering of Soldiers; Security from Unreasonable, Unwarrantable Search and Seizure; Right to be Prosecuted Only Upon Grand Jury Indictment; Right of Trial By Jury; Freedom from Excessive Bail, Fines and Cruel and Unusual Punish-

ment—there is no constitutional right per se to wear one's hair—head or facial—as one sees fit just as there is no constitutional right per se to sleep or eat as one sees fit. These matters, like many others too numerous to mention, are simply not specifically mentioned in our Constitution. While some unmentioned peripheral rights [1] have been held to be encompassed by other language of the Constitution, the right sought in this case—to wear one's hair as one sees fit—has not been found to be within the periphery of any of our specific Constitutional Rights. Among the cases supporting this conclusion is Karr v. Schmidt, 460 F.2d 609 (5th Cir. 1972), in which our United States Court of Appeals for the Fifth Circuit in reversing the United States District Court for the Western District of Texas, held squarely that there is no constitutionally protected right—plainly expressed or within the penumbra, the shadow, of the First, Eighth, Ninth, Tenth and Fourteenth Amendments—to wear one's hair in a public high · school in the length and style that suits the wearer. Appropriately, Judge Morgan writing for the court said:

"In conclusion, we emphasize that our decision today evinces not the slightest indifference to the personal rights asserted . . . Rather, it reflects recognition of the inescapable fact that neither the Constitution nor the federal judiciary it created were conceived to be keepers of the national conscience in every matter great and small. The regulations which impinge

---

1. Illustrative of the periphery of the enumerated constitutional rights is the case of Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L.Ed.2d 510, in which the Supreme Court recites that included within the First Amendment rights of freedom of speech and press are "not only . . . the right to distribute, the right to receive, the right to read . . . and freedom of inquiry, freedom of thought, and freedom to teach . . .—indeed the freedom of the entire university community." p. 482, 85 S. Ct. p. 1680. The Court also noted that the First Amendment includes the " 'freedom to associate and privacy in one's associations,' " (p. 483, 85 S.Ct. p. 1681) and then went on to state:

"The foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. See Poe v. Ullman, 367 U.S. 497, 516–522, 81 S.Ct. 1752, 6 L.Ed.2d 989, [1003–1007] (dissenting opinion). Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The Third Amendment in its prohibition against the quartering of soldiers 'in any house' in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'

"The Fourth and Fifth Amendments were described in Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L. Ed. 746, [751] as protection against all governmental invasions 'of the sanctity of a man's home and the privacies of life.' We recently referred in Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L. Ed.2d 1081, [1090] [84 A.L.R.2d 933] to the Fourth Amendment as creating a 'right to privacy, no less important than any other right carefully and particularly reserved to the people.' See Beaney, The Constitutional Right to Privacy, 1962 Sup Ct Rev 212; Griswold, The Right to be Let Alone, 55 Nw UL Rev 216 (1960)." Id. at 484, 485, 85 S.Ct. at 1681.

After doing so the Court concluded that our citizens' right of privacy includes the marriage relationship, saying:

"We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions." Id. at 486, 85 S.Ct. at 1682.

on our daily affairs are legion. Many of them are more intrusive and tenuous than the one involved here. The federal judiciary has urgent tasks to perform, and to be able to perform them we must recognize the physical impossibility that less than a thousand of us could ever enjoin a uniform concept of equal protection or due process on every American in every facet of his daily life." *Id.*, at 618.

The Supreme Court "as a whole" declined on November 6, 1972, to hear a further appeal of the case. 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256. Illuminating is what the late Justice Black wrote in refusing to stay the order of the Fifth Circuit staying the district judge's order:

> "I refuse to hold for myself that the federal courts have constitutional power to interfere in this way with the public school system operated by the States. And I furthermore refuse to predict that our Court will hold they have such power. It is true that we have held that this Court does have power under the Fourteenth Amendment to bar state public schools from discriminating against Negro students on account of their race but we did so by virtue of a direct, positive command in the Fourteenth Amendment, which, like the other Civil War Amendments, was primarily designed to outlaw racial discrimination by the States. There is no such direct, positive command about local school rules with reference to the length of hair state school students must have. And I cannot now predict this Court will hold that the more or less vague terms of either the Due Process or Equal Protection Clause have robbed the States of their traditionally recognized power to run their school systems in accordance with their own best judgment as to the appropriate length of hair for students." [401 U.S. 592, 91 S.Ct. 592, 27 L.Ed.2d 797]

Also supporting this conclusion is the decision of the United States District Court for the District of Columbia in the adult male hair regulation case of Fagan v. National Cash Register Co., 157 U.S.App.D.C. 15, 481 F.2d 1115 (1973).

■ Having concluded that plaintiffs do not have a constitutional right to wear their hair—head and facial—as they wish to, it is next necessary to determine whether or not a state through a municipality—the City of Macon, Georgia—may legally regulate the hair of its male police officers in the manner that this municipality has done. The standard for making that determination, contrary to the contentions of the plaintiffs is the same as set forth by the Fifth Circuit of Appeals in Karr v. Schmidt, *supra*, count 616:

> ". . . State regulations which do not affect fundamental freedoms are subject to a much less rigorous standard of judicial review than is applicable when such fundamental rights are at stake. In such cases, the appropriate standard of review is simply one of whether the regulation is reasonably intended to accomplish a constitutionally permissible state objective. See, e.g., Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 491, 75 S.Ct. 461, 99 L.Ed. 563, 574; Ferguson v. Skrupa, supra [372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93]. Moreover, the burden is not upon the state to establish the rationality of its restriction, but is upon the challenger to show that the restriction is wholly arbitrary."

Explanatory of this language is Judge Bell's concurring opinion:

> "The burden of proof—arbitrary standard—rational basis frame of reference is explicated by the knowledge that we have previously equated arbitrariness with an absence of rational basis. In Bicknell v. United States, [5 Cir., 1970, 422 F.2d 1055, it was said: '. . . In the law arbitrary . . . means "having no rational basis." ' 422 F.2d at 1057." *Karr, supra*, at 618.

■ The evidence offered by plaintiffs does not begin to prove that there is no rational basis for the subject regulations of the Macon Police Department, does not begin to prove that they are arbitrary. Viewed not just from the standpoint of this police department but from the standpoint of police departments in general, this court shares the following views of the United States Court of Appeals for the Eighth Circuit and adopts them as its view:

"Traditionally, the policeman has been a highly trained officer who is entrusted with a responsible and oftentimes dangerous role as a public servant. His work habits on active duty require disciplined conduct, regimentation and frequent strict adherence to regulation and authorized detail. His job is often a delicate and difficult task to lawfully act against those who are sometimes unwilling to recognize any rules or ethics. It is essential that a policeman's training be such that he be taught to obey strict disciplinary procedure and rules in order to lend practical assurance that he will follow command and not abuse his his awesome authority. As part of this discipline the police department has determined that an officer shall be neat in his appearance. There can be little argument that this requirement constitutes a legitimate departmental interest.

"We reject the idea that community standards provide a legitimate basis in weighing constitutional rights guaranteed to the individual. Whether public acceptance or rejection of a particular hair style exists in one community or another should not be a standard of concern to a federal court. What must be controlling to the court in evaluating competing interests is whether the policy of the state espouses a societal interest which outweighs the individual concern. Thus, what is essential here is that the Public Safety Department stresses the need for public respect of its officers and that it feels such respect flows in part from the officers' individual appearance. If Chief Andersen misjudges, as plaintiff suggests, what necessary measures should be taken to achieve community respect, this basically must be the department's concern, not ours.

"One may argue that how one wears his hair has little to do with whether an officer might effectively apprehend criminals or otherwise fulfill his assigned mission as a policeman. This misses the mark. The critical factor is that police officialdom deems it necessary that the officer be well disciplined and that as part of that internal discipline, he be required to maintain a neat appearance. The degree of that appearance, as long as it is not arbitrary or unreasonable, should not be the court's concern.

"Unlike the school cases, those officials who have spent their life in police work, who are trained in law enforcement discipline, possess far better empirical judgment of what is essential to achieve an efficient and disciplined police force than the officers themselves, the public or the predelicition of individual judges. If this results in a problem of low morale of police personnel, which plaintiff contends, this too is Chief Andersen's dilemma, not the courts'. This does not mean that the courts will ignore an arbitrary edict which might deprive a police officer of his sense of dignity or morality as a human being. But we are not dealing with arbitrariness —the only issue before us is the authority of a Public Safety Division of a municipality to set standards of neat appearance for its personnel balanced against the individual rights of a police officer to appear as he likes. In light of this competing and legitimate interest of the Public Safety Division, as weighed against the individual officer's personal likes or dislikes, we sustain the regulation. In accord Greenwald v. Frank, 70 Misc.2d 632, 334 N.Y.S.2d 680 (Sup.Ct.1972); Dwen v. Barry, 336 F.Supp. 487 (E.D. N.Y.1971); cf. Doyle v. Koelbl, 434

F.2d 1014 (5 Cir. 1970), cert. denied, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed. 2d 649 (1971)." Stradley v. Andersen, 478 F.2d 188, 190, 191 (8th Cir. 1973).

Substitute the words "Macon Police Department" for the words "Public Safety Department", and "Chief Brooks" for "Chief Andersen" and the aforesaid is the opinion of this court.

For all of the aforesaid reasons [2] there is neither constitutional nor legal invalidity to the rules, regulations and policies of the City of Macon Police Department limiting the length of the hair of its male police officers and prohibiting long sideburns, mustaches and beards. It is so declared. Judgment will be entered for the defendants.

2. Though not discussed in specific detail, the court is of the opinion that there is no merit to plaintiffs' argument that since women may have long hair and they may not, they are denied the equal protection of the law.