489 So.2d 1326 (1986)
LOR, INC.
v.
MARTIN EXPLORATION COMPANY, Chevron USA, Inc., F.F.K. Gas & Oil Properties f/k/a F.F.K. Oil Company, and W.R. Fairchild Construction Company, Ltd. and its General Partners, Wiley Fairchild, Charles D. Fairchild, Herbert D. Fairchild and Rodney Fairchild
NEWPARK PIPE & SUPPLY, INC.
v.
MARTIN EXPLORATION COMPANY, Chevron USA, Inc., F.F.K. Gas & Oil Properties f/k/a F.F.K. Oil Company, and W.R. Fairchild Construction Company, Ltd. and its General Partners, Wiley Fairchild, Charles D. Fairchild, Herbert D. Fairchild and Rodney Fairchild
NEWPARK WASTE TREATMENT SYSTEMS, INC.
v.
MARTIN EXPLORATION COMPANY, Chevron USA, Inc., F.F.K. Gas & Oil Properties f/k/a F.F.K. Oil Company, and W.R. Fairchild Construction Company, Ltd. and its General Partners, Wiley Fairchild, Charles D. Fairchild, Herbert D. Fairchild and Rodney Fairchild
NEWPARK FLUID SERVICES, INC.
v.
MARTIN EXPLORATION COMPANY, Chevron USA, Inc., F.F.K. Gas & Oil Properties f/k/a F.F.K. Oil Company, and W.R. Fairchild Construction Company, Ltd. and its General Partners, Wiley Fairchild, Charles D. Fairchild, Herbert D. Fairchild and Rodney Fairchild
GUILLORY TANK TRUCK SERVICES, INC.
v.
MARTIN EXPLORATION COMPANY, Chevron USA, Inc., F.F.K. Gas & Oil Properties f/k/a F.F.K. Oil Company, and W.R. Fairchild Construction Company, Ltd. and its General Partners, Wiley Fairchild, Charles D. Fairchild, Herbert D. Fairchild and Rodney Fairchild.
Nos. CA 85-0344 to CA 85-0348.
Court of Appeal of Louisiana, First Circuit.
May 28, 1986.
*1327 Emmett Sole, Lake Charles, James Kuhn, Denham Springs, for defendants/appellees-Chevron.
Edward D. Wegmand, New Orleans, for plaintiffs/appellants-Lor, Inc.; Guillory Tank Truck Service; Newpark Resources, et al.
John Dale Powers, Baton Rouge, for defendants/appellees-F.F.K. Gas and Oil.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
LANIER, Judge.
These are five consolidated suits by furnishers of labor, services and supplies on a dry hole oil well seeking recognition and enforcement of privileges granted by the Louisiana Oil, Gas and Water Well Lien Act, La.R.S. 9:4861. Subsequently, the furnishers filed a supplemental and amending petition alleging that other drilling and production units had been established on portions of the leased premises on which their privileges attached, that the defendants had the power to conceal and dispose of any revenues accruing to the mineral lease thereon and that said furnishers were entitled to a writ of sequestration to protect their privileges. The trial court issued a writ sequestering (1) the oil, gas and mineral lease in question; (2) all oil, gas or other minerals produced from the lease; (3) the proceeds of the sale of any oil, gas or other minerals produced from the lease; and (4) all oil, gas and other minerals produced from the well for which the labor, services *1328 and supplies were furnished. The lessee in the lease filed a motion to dissolve the writ of sequestration in its entirety or, in the alternative, to limit the sequestration order to the production and proceeds of the dry hole well. After a hearing, the trial court rendered judgment dissolving the writ of sequestration insofar as it pertained to two forced conservation units which covered parts of the leased premises and which had producing wells. The furnishers took this suspensive appeal.[1]

FACTS
The basic facts in this case are set forth in JHJ Limited I v. Chevron U.S.A., Inc., 617 F.Supp. 729, 731 (M.D.La.1985), as follows:
Chevron is the lessee in an oil, gas and mineral lease dated November 10, 1973, referred to as the Wunsch lease, covering some 127 acres of land situated in Livingston Parish.
By an order dated October 15, 1981, the Commissioner of Conservation created a unit (the S Unit) which included about 89 acres of Chevron's Wunsch lease. The Commissioner ordered that each tract included in the unit was to share in production from the unit well in proportion to the surface area each tract bears to the entire surface area of the unit. The unit was created for the purpose of insuring orderly mineral development, to prevent waste and to avoid the drilling of unnecessary wells.
Although Chevron received timely notice of the unit application and the hearing thereon, it chose not to participate in or oppose the proceedings.
The Commissioner's order designated Celt Oil Co., Inc. as the unit operator and Celt requested Martin Exploration Company to handle the engineering aspects of the drilling of the unit well.
The Commissioner chose Chevron's Wunsch lease as the surface location for The S Unit well. Again, Chevron had notice of this hearing but chose not to attend or to participate.
Chevron agreed to let Martin use its Wunsch lease surface rights but refused to participate in the cost of the drilling of the well. Subsequently, Martin was designated as unit operator, vice Celt.
. . . .
The well was spudded in on January 15, 1982.
. . . .
Subsequently, Chevron granted a farmout agreement to Martin covering that portion of the Wunsch lease (about 89 acres) which was included in the S Unit, effective March 1, 1982. Under the farmout agreement, Martin would earn an interest in the lease if the well drilled at its sole cost produced minerals in paying quantities.
. . . .
In June 1982, when the well had reached a depth of 19,954 feet, Martin suspended operations and no further operations have taken place since then. The well has never been completed as a commercial producer and Martin has never *1329 earned any interest in the Wunsch lease.
. . . .
Portions of the Wunsch lease have also been force pooled into two other units by orders of the Louisiana Commissioner of Conservation, the H Unit and the F Unit. Unit wells on both of those units have been successfully completed and Chevron's Wunsch lease has a working interest in all production from each of those wells. Neither well is physically located on the Wunsch lease and Chevron's participation in the production arises solely from the force pooling orders of the Commissioner.
The furnishers herein and the amounts of their claims are as follows:

1. Newpark Fluid Services,
 Inc.  $1,135,423.07
2. Guillory Tank Truck
 Services, Inc.  7,823.40
3. Newpark Waste
 Treatment Systems, Inc.  30,062.75
4. Newpark Pipe and Supply,
 Inc.  473,991.02
5. LOR, Inc.  18,675.40
 _____________
 TOTAL $1,665,975.64

All of the labor, services and supplies provided by these furnishers went into the drilling of the Wunsch # 1 well in the S Unit. None of the labor, services and supplies were furnished for the unit wells in the F and H Units.[2]

EXTENT OF LOUISIANA OIL WELL PRIVILEGE
At the time[3] the Wunsch # 1 well was drilled on the Wunsch lease, La.R.S. 9:4861 provided as follows:

Any person who performs any labor or service in drilling or in connection with the drilling of any well or wells in search of oil, gas or water, or who performs any labor or service in the operation or in connection with the operation of any oil, gas or water well or wells, has a privilege on all oil or gas produced from the well or wells, and the proceeds thereof inuring to the working interest therein, and on the oil, gas or water well or wells and the lease whereon the same are located, and on all drilling rigs, standard rigs, machinery, appurtenances, appliances, equipment, buildings, tanks, and other structures thereto attached or located on the lease, for the amount due for labor or service, in principal and interest, and for the cost of preparing and recording the privilege, as well as ten per cent attorney's fees in the event it becomes necessary to employ an attorney to enforce collection. Any person who does any trucking, towing, or barging, or who makes any repairs, or furnishes any fuel, drilling rigs, standard rigs, machinery, equipment, materials or supplies for or in connection with the drilling of any well or wells in search of oil, gas or water, or for or in connection with the operation of any oil, gas, or water well or wells, whether or not a producing well is obtained and whether or not such materials, machinery, equipment, services and supplies are incorporated in or become a part of the completed oil, gas or water well, has a privilege on all oil or gas produced from the well or wells and the proceeds thereof inuring to the working interest therein and on the oil, gas or water well or wells and the lease whereon the same are located, and on all drilling rigs, standard rigs, machinery, appurtenances, appliances, equipment, buildings, tanks and other structures thereto attached for drilling, equipment and operation of the well or lease, for the amount due for such trucking, towing, barging, repairs, fuel, drilling rigs, standard rigs, machinery, equipment, material, or supplies, in principal and interest, and for the cost of preparing and recording the privilege, as well as ten per cent attorney's fees in the event it becomes necessary to employ an attorney to enforce collection thereof. This privilege is second in rank only to the privilege granted in favor of laborers.
*1330 [Emphasis added.]
We believe the excellent opinion of our learned brother in the federal district court correctly determined the extent of the Louisiana oil well privilege in JHJ Limited I, 617 F.Supp. at 732-733, as follows:
The Louisiana statute, LSA-R.S. 9:4861 grants a privilege or lien to "any person who performs any labor or service" and to any person who "furnishes any fuel, drilling rigs, standard rigs, machinery, equipment, material or supplies" in connection with the drilling of a well to search for oil, gas or water, inter alia, "... on all oil or gas produced from the well or wells and the proceeds thereof inuring to the working interest therein, and on the oil, gas or water well or wells and the lease whereon the same are located ..." (emphasis supplied).
Although no Louisiana appellate court has passed upon this precise question, this court has little difficulty in concluding that the statute means exactly what it saysa supplier of well drilling services and equipment is granted a privilege upon "the lease whereon" the well is located. The well drilled by JHJ is located upon the Wunsch lease. Accordingly, JHJ is entitled to a privilege upon the Wunsch lease.
Chevron's argument to the contrary presents a convoluted, serpentine trail through the Louisiana conservation laws concluding with the proposition that, for purposes of the Oil Well Lien Act (but for no other purpose) the action of the Commissioner of Conservation in force pooling three different areas of the Wunsch lease with other leases had the effect of dividing the lease "for operational purposes" into three separate and independent tracts1 thus limiting JHJ's privilege to the area of the Wunsch lease included in the S Unit, where the well was drilled. Since the well was not completed as a producer, a privilege upon that portion of the Wunsch lease would be of little benefit to JHJ.
1. Chevron does not mention it but presumably, its argument dictates that the portion of the Wunsch tract which is not included in any unit would constitute a fourth tract.
. . . .
The orders of the Commissioner of Conservation regulating the development of the various underground pools in the vicinity of the Wunsch lease have no effect upon and are not in conflict with the private contractual undertakings between the various landowners, lessees and operators. Accordingly, the Commissioner's order has not divided the obligation of the Wunsch lease and Chevron is the first to point out that production from either the F Unit well or the H Unit well maintains Chevron's Wunsch lease in its entirety, despite the admitted fact that neither well is located upon the Wunsch land. Neither the subsurface geology nor the Commissioner's order conflicts with or serves to change the obligations of the Wunsch lease (except the obligation to drill on the land); Chevron still has a single lease covering the entire acreage and LSA-R.S. 9:4861 unambiguously grants to the supplier of labor, material and equipment, a privilege on "the lease whereon" the well is drilled. This well is located on the Wunsch lease; JHJ has a privilege on the entirety of that lease.
We agree that La.R.S. 9:4861 is clear and free from ambiguity in providing that the privilege granted therein extends to "the lease whereon the same are located". Louisiana courts are obligated to give effect to such expressions of the legislative will as written. La.C.C. art. 13; La.R.S. 1:4; Hebbler v. New Orleans Fire Department, 310 So.2d 113 (La.1975); Bunch v. Town of St. Francisville, 446 So.2d 1357 (La.App. 1st Cir.1984). The trial court committed error by interpreting La.R.S. 9:4861 so as to restrict the extent of the privilege granted therein only to the S Unit.
This assignment of error has merit.

CONSTITUTIONALITY OF LA.R.S. 9:4861 AS INTERPRETED HEREIN
Chevron contends that, if La.R.S. 9:4861 is interpreted to apply the privilege to the entirety of the Wunsch lease, then it will be unconstitutionally deprived of its property *1331 (proceeds of production attributable to Wunsch lease in the F and H Units) without due process in violation of La.Const. of 1974, art. I, §§ 2, 3 and 4 and the 5th and 14th Amendments of the United States Constitution.
In JHJ Limited I, 617 F.Supp. at 733-734, the federal district court disposed of this argument with the following, which we adopt as our own:
Chevron next argues that such a construction calls the Louisiana Oil Well Lien Act into constitutional question. Asserting that as a "carried interest" in the Wunsch well, who did not initiate the unitization proceedings, did not join in the drilling of the well, did not participate in the selection of the well site and refused to join in paying the cost of the proposed well, Chevron would be liable to the operator for only its proportionate share of the well drilling cost and only out of production; LSA-R.S. 31:177, Chevron then argues that the recognition of a privilege against the entire lease amounts to an unconstitutional taking of its property in violation of the Fourteenth Amendment.
Chevron's argument is wanting. It should first be noted that Chevron incurs no personal liability to JHJ. The privilege is strictly in rem, against the property (lease) only. Second, as an abstract proposition, if the evidence here showed that, through orders of the state, without Chevron's knowledge or consent, a well were drilled upon its lease and that the well produced no benefit to Chevron, it might have some complaint of constitutional dimension. This well, however, was not drilled over Chevron's protest or in the dead of night without its knowledge and consent. The stipulated facts show that Chevron consented to the drilling of the well on its lease; first, it granted Martin surface rights to drill the well on the lease and second, it later actually entered a farmout agreement with Martin under which it specifically consented to Martin's drilling the well.[[4]]

*1332 Chevron took these actions being held to knowledge of the provisions of the Louisiana Oil Well Lien Act. The purpose of that Act is to protect those, like JHJ, who contribute labor, services and equipment to the drilling of wells from the default of those who engage them. Standard Supply and Hardware Co. v. Humphrey Bros. 209 La. 979, 26 So.2d 8 (1946). The privilege granted by that statute attaches to all property listed in the statute, regardless of ownership, Blankenship v. Stovall, 159 So. 477 (La. App. 2d Cir.1935), and requires no contractual relationship between the supplier and the owner of the lease. Oil Well Supply Co. v. Independent Oil Co., 219 La. 936, 54 So.2d 330 (1951).
The parties differ over whether Chevron gained any benefit from the drilling of the well on its lease by Martin. While a finding of benefit to Chevron is not necessary to the decision in this case, because Chevron consented to the drilling of the well, it can be noted that Chevron gained exactly the same benefit that any other mineral lessee gains by the drilling of a dry hole on its lease. One such benefit is fulfillment of the mineral lessee's obligation to develop the property in a reasonable and prudent manner which Louisiana courts have long recognized, see e.g. Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26 (1948), and which is now included in the Mineral Code, LSA-R.S. 31:122. Surely Chevron would take the position with its lessors that the drilling of the Martin well fulfilled Chevron's obligation to develop the lease.
The Louisiana Oil Well Lien Act is purely economic legislation; it involves no fundamental federal right and affects no suspect class. Thus, under both substantive due process and equal protection analysis, the federal Constitution requires only that the state statute be rationally related to a legitimate state goal. Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The question of the wisdom or utility of such legislation is for the legislature, not the courts. Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). Here regulation and conservation of Louisiana's minerals is a legitimate state interest, as is the protection of persons who perform labor or furnish services in connection with the drilling of oil, gas and water wells. Granting a lien on the entire lease where the activity giving rise to the lien occurred is rationally related to these state interests and it is not for this court to say that the legislature might have more logically limited the lien as argued by Chevron. Wilson P. Abraham Const. Co. v. Texas Industries, Inc., 604 F.2d 897 (5th Cir.1979).
La.R.S. 9:4861 is constitutional under the constitutions of the United States and the State of Louisiana.

DECREE
For the foregoing reasons, the judgment of the trial court which dissolved the writ of sequestration insofar as it pertained to the portions of the Wunsch lease located in the F and H units is reversed, and the original writ of sequestration issued herein is reinstated. Pursuant to the requirements of La.C.C.P. art. 2089, the immovable property which is subject to this writ of sequestration is particularly described as follows:
All right, title and interest of CHEVRON U.S.A. INC., formerly CHEVRON OIL COMPANY (hereinafter "Chevron"), and F.F.K. Gas & Oil Properties f/k/a F.F.K. Oil Company, and W.R. Fairchild Construction Company, Ltd., and, its general partners, Wiley Fairchild, Charles D. *1333 Fairchild, Herbert D. Fairchild and Rodney Fairchild in and to: (1) that certain oil, gas & mineral lease entered into on November 10, 1973, by and between Robert H. Wunsch, husband of Vietta Lockhart Wunsch and Chevron, recorded on November 27, 1973 in Livingston Parish in C.O.B. 184, Page 267, Entry No. 97996... including all oil, gas or other minerals produced therefrom and the proceeds from any sale of oil, gas or other mineral produced from said lease; and (2) all oil, gas or other minerals produced from that certain oil, gas or mineral well, designated as the Wunsch # 1, and being located on the aforementioned lease, and the proceeds thereof inuring to the working interests therein.
The above-described oil, gas and mineral lease affects the following described lands, to-wit:
TRACT 1: A certain tract of land in the second ward of the Parish of Livingston, State of Louisiana, and described as follows: 105 acres of land in Section 48, Township 6 South, Range 3 East, and bounded, now or formerly, North by the lands of Roberts; East by Grays Creek and Troy Roberts; South by the Baton Rouge Hammond & Eastern Railroad Company; and West by the lands of Mrs. A.A. Jones and Noah Stafford; being the same land acquired by Lessor herein by Judgment of Possession dated March 5, 1936 and recorded in Conveyance Book 102, Folio 439 of the Conveyance Records of Livingston Parish, Louisiana; LESS AND EXCEPT:
(a) 20 acres of the aforesaid tract of land sold by Edward Wunsch to Monroe Rheams; and
(b) a certain tract or parcel of ground, containing 0.3102 acres, lying and being situated in the Parish of Livingston, State of Louisiana, in Section 48, Township 6 South, Range 3 East, and more particularly described as Parcel "C" on the plat attached to an Act of Sale from Robert H. Wunsch to the Gravier Corporation, said act being dated November 28, 1967 and recorded in Conveyance Book 133, Folio 692 of the Records of Livingston Parish, Louisiana; and
(c) a certain tract or parcel of ground containing 9.6 acres, situated in the Parish of Livingston, State of Louisiana, in Section 48, Township 6 South, Range 3 East and being more particularly described as follows, to-wit: From a point which is the Northeast corner of Kimberly Heights Subdivision run South 10 degrees West 1,389 feet and corner, thence East 300 feet and corner, thence North 10 degrees East 1,389 feet and corner, thence West 300 feet and corner, thence South 10 degrees West 50 feet to point of beginning, all according to a plat of a survey by Kerstens, C.E., dated September 25, 1962; being the same tract conveyed by Robert H. Wunsch, Lessor herein, to Arthur A. Thibodeaux by Act of Sale dated January 8, 1963 and recorded in Conveyance Book 105, Folio 166 of the Records of Livingston Parish, Louisiana.
TRACT 2: A certain piece of land in the second ward of the Parish of Livingston, State of Louisiana, lying and being situated in Section 48, Township 6 South, Range 3 East and containing 8.16 acres, known and described as follows: Beginning at the Southeast corner of Section 48, Township 6 South, Range 3 East, thence South 89 degrees 50 minutes West 7.13 chains to a corner; thence North 0 degrees 25 minutes East 11.79 chains to a corner in the center of road; thence with traverse of road to a corner on the East line of Section 48; thence South 25 degrees West 11.11 chains back to the place of beginning, as per survey made by L.B. Harris; being part of the same land acquired by Lessor herein by Judgment of Possession dated March 5, 1936 and recorded in Conveyance Book 102, Folio 439 of the Records of Livingston Parish, Louisiana; LESS AND EXCEPT: A certain tract or parcel of land containing 0.75 acres, more or less, and located in Section 48, Township 6 South, Range 3 East, Livingston *1334 Parish, State of Louisiana, and being more particularly described according to a plat of survey, dated December 2, 1969, by J.C. Kerstens, C.E. and surveyor, entitled "Plat of Survey of Lot out of R.H. Wunsch Tract in Sections 48 and 32, Township 6 South, Range 3 East, G.L.D., Livingston Parish," a copy of which is attached to an Act of Sale dated December 12, 1969 and recorded in Conveyance Book 148, Folio 269 of the Records of Livingston Parish, Louisiana, by which Act said 0.75 acre tract was conveyed by Lessor herein to R.T. Bonneval; said 0.75 acre tract being more particularly described as follows: From the Southeast corner of Denham Heights Subdivision proceed South 6 degrees 30 minutes West a distance of 80 feet; thence South 83 degrees 30 minutes East a distance of 755 feet to point of beginning; thence go South 83 degrees 30 minutes East a distance of 165 feet to corner; thence South 1 degree 0 minutes East a distance of 200 feet to point of corner; thence North 83 degrees 30 minutes West a distance of 165 feet to point and corner; thence go North 1 degree 0 minutes West a distance of 200 feet to point of beginning.
TRACT 3: A certain tract of land containing 14.67 acres, situated in the second ward of the Parish of Livingston, State of Louisiana, Section 48, Township 6 South, Range 3 East, and described as follows, to-wit: Starting at an iron stake cornering the lands of J.C. Cooper on West and E.E. Wunsch on South, running North 15 degrees 30 minutes East 11.32 chains to an iron stake on Model Road on North and J.C. Cooper on West, thence running 70 degrees 30 minutes East 3.75 chains; thence South 89 degrees 40 minutes East, thence North 79 degrees 4.66 chains to an iron stake cornering on North and Joe Kimble on East, thence South 19 degrees 45 minutes West 11.31 chains to an iron stake, Joe Kimble on East and E.E. Wunsch on South; thence starting at the Southwest corner and running South 89 degrees 30 minutes East 17.79 chains to the iron stake cornering with Joe Kimble on East and E.E. Wunsch on South as per blue print attached to title as per act of record recorded in Book 37, page 127 of the Conveyance records of the Parish of Livingston, State of Louisiana; being part of the land acquired by Lessor herein by Judgment of Possession dated March 5, 1936 and recorded in Conveyance Book 102, Folio 439 of the Records of Livingston Parish, Louisiana.
TRACT 4: A certain tract of land, lying and being situated in Section 32, Township 6 South, Range 3 East, Parish of Livingston, State of Louisiana, containing 14.55 acres, and more particularly described as follows, to-wit: Begin at the Southeast corner of Section 48, thence North 89 degrees 50 minutes East 1440 chains to a corner, thence North 0 degrees 15 minutes East 870 chains to a corner on the public road returning to place of beginning; thence 0 degrees 26 minutes East 11.0 chains to public road, thence with traverses of road to a corner previously established; being the same land acquired by E.E. Wunsch by Deed of record in Conveyance office Book 28, Folio 178; being part of the land acquired by Lessor herein by Judgment of Possession dated March 5, 1936 and recorded in Conveyance Book 102, Folio 439; all of the Records of Livingston Parish, Louisiana.
TRACT 5: A certain tract of land, lying and being situated in Sections 32 and 33, Township 6 South, Range 3 East, containing 15.60 acres, more or less, and being described more particularly as follows: Commencing at the Southeast corner of Section 32 and measure East 4.74 chains to Southeast corner of a one and one-half acre strip, thence North 6.21 chains to station 1280 of Model Road Survey, thence West 6.0 chains along said survey, thence North 82.5 degrees West 12.92 chains to East line of Eden Church property, thence South 1.72 chains to corner of road, *1335 thence North 76 degrees West 4.45 chains, thence South 7.14 chains to wire fence, thence East along said fence 18.55 chains to point of beginning; and being the same property acquired by Lessor herein by Judgment of Possession dated March 5, 1936 and recorded in Conveyance Book 102, Page 439 of the Records of Livingston Parish, Louisiana.
Chevron is cast for the cost of this appeal.
REVERSED AND RENDERED.
NOTES
[1] The furnishers also applied to this court for a supervisory writ which was denied with the following rationale:

The judgments granting partial dissolutions of the writs of sequestration may cause irreparable injury to relators since the judgment released from sequestration the most valuable assets previously sequestered. Therefore, we find no distinction between the instant matter and those cases in which writs of attachment and/or sequestration were wholly dissolved and such judgments were entertained on appeal. The judgment herein is an interlocutory order which may cause irreparable injury. See LSA-C.C.P. Art. 2083; Pittman v. Lilly, 197 La. 233, 1 So.2d 88 (1941); Big "A" Sand & Gravel Co. v. Bay Sand & Gravel, 262 So.2d 66 (La.App. 1st Cir.), writ denied, 262 La. 467, 263 So.2d 727 (1972). See e.g. Goldberg v. P & R Company, 429 So.2d 554 (La.App. 4th Cir.), writ denied, 433 So.2d 1055 (La.1983); Yorkwood Savings and Loan Association v. Thomas, 379 So.2d 798 (La.App. 4th Cir.1980); Gretna Finance Company v. Camp, 212 So.2d 857 (La.App. 4th Cir.1968). See also Carpenter v. Carpenter, 419 So.2d 999 (La.App. 4th Cir. 1982); Smith v. Utility & Maintenance Contractors of America, Inc., 301 So.2d 906 (La. App. 2nd Cir.1974), writ denied, 305 So.2d 1539 [539] (La.1975). Relators' proper remedy is by appeal. Moreover, we note that relators state in their application for writs that they have perfected a suspensive appeal from the judgments at issue.
[2] JHJ Limited I provided Martin with oil and gas drilling equipment, supplies and services in connection with the drilling of the well and conducted the drilling operations in the S Unit.
[3] La.R.S. 9:4861 was amended by Act 949 of 1984.
[4] In brief, Chevron contests the accuracy of the facts contained in this paragraph. However, also in brief, Chevron concedes it entered into the following stipulations of fact in the JHJ Limited I case:

7. After the creation of the S Unit, Celt requested Martin Exploration Company ("Martin") to handle the engineering aspects of drilling the unit well for the S Unit, and to coordinate the execution of the required agreements with the other working interest owners in this unit. (Exhibit "D-9")
8. To accomplish that purpose, an operator's meeting was held in Martin's offices on November 13, 1981. At that time, Martin proposed, and the parties in attendance concurred, that the unit well for the S Unit should be drilled on Chevron's Wunsch lease acreage as the optimum location for the unit well. Again, even though it had received prior notice of this operator's meeting, Chevron chose not to attend or participate in it. Later, Chevron learned that its Wunsch lease had been selected as the surface location for the S Unit well in a letter from Martin dated November 16, 1981, three days after the operator's meeting was held. (Exhibit "D-10")
9. In view of that decision, Chevron agreed to let Martin use its Wunsch lease surface rights in the S Unit so as to facilitate operations for the drilling, completing and producing of the R.H. Wunsch No. 1 Well. (Exhibit "D-10")
10. However, Chevron refused to participate in the cost to drill this well. It did so on the basis of its evaluation of the geology and economics pertinent to the prospect, and on the fact that Chevron believed that [sic] did not have to drill a well in the S Unit in order to maintain its rights under the Wunsch lease. The Wunsch lease does not contain a Pugh clause (Exhibit "D-I") and during this time, Amoco was conducting drilling operations on (and subsequently obtained production from) two other units in which the Wunsch lease participates.
. . . .
15. After the commencement of these drilling operations, Martin solicited Chevron for a farmout of that portion of its Wunsch lease acreage which had been included within the boundaries of the S Unit.
16. By letter dated February 9, 1982, Chevron advised Martin of the terms under which Chevron would agree to a farmout (Exhibit "D-13"), which terms, in principal, were found to be acceptable by Martin in its letter to Chevron of February 11, 1982. (Exhibit "D-14") The final agreement was consummated by the parties on April 20, 1982, but was made effective as of March 1, 1982. (Exhibit "D-15")
17. Under the terms of this farmout, Martin acquired the right to earn certain interests in the Wunsch lease insofar, and only insofar, as it was included within the S Unit. To do so, Martin had to drill, at its option, the R.H. Wunsch No. 1 Well at its sole risk, cost and expense to completion as a commercial producer. In exchange, Chevron bore no responsibility for any share of the cost to drill this well. However, if it was completed as a commercial producer, then under the terms of the farmout, Chevron was entitled to receive an overriding royalty interest, convertible to a working interest after payout, on that portion of the well's production attributable to the farmout acreage, i.e., that portion of the Wunsch lease which is included within the boundaries of the S Unit.