In re ESTATE OF Amelia M.
TURNER, Deceased.

No. C2–85–1136.

Supreme Court of Minnesota.

Aug. 8, 1986.

Dennis D. Daly, Jr., St. Paul, for Estate.

Tom Foley, Ramsey Co. Atty., David Fortney, Kevin Short, Asst. Co. Attys., St. Paul, for Ramsey County.

Hubert H. Humphrey, III, Atty. Gen., Patricia Sonnenberg, Sp. Asst. Atty. Gen., St. Paul, for intervenor.

AMDAHL, Chief Justice.

The sole issue in this case is whether Minn.Stat. § 256B.15 (1984) denies equal protection to individuals who receive medical assistance after age 65. The law at issue is an estate collection statute which gives the state a claim in a decedent's estate to recover amounts paid to the decedent in medical assistance, but only as to amounts paid after decedent turned 65. In this case, Amelia Turner's estate charges that this differentiation between amounts paid to individuals before their 65th birthday and after their 65th birthday is in no way rationally related to a legitimate governmental purpose and is thus a denial of equal protection as guaranteed by our state and federal constitutions. U.S.Const. amend. XIV, § 1; Minn.Const. art. 1, § 7.

There is no dispute over the facts of this case. In September 1975, decedent and her husband were placed under guardianship by order of the Ramsey County Probate Court. Decedent's longtime friend and neighbor, Minnie Tucci, was appointed their guardian. Three years before this, Tucci was named the primary beneficiary of the Turners' joint estate. At the time of the probate court's order, the Turners' assets consisted of $6,229.88 in cash, a $14,000 house, and a railroad pension and social security benefits totaling $500 per month.

The Turners remained in their home until January 1977, when their deteriorating mental and physical conditions prompted Tucci to move them into a nursing home.

Shortly thereafter, Tucci applied for medical assistance on behalf of the Turners from the Ramsey County Welfare Department. Both applications were accepted and the Turners began to receive medical assistance in March 1977. Later that year, with the court's permission, Tucci sold the Turners' house which allowed them to be taken off the medical assistance rolls. This money was exhausted by May 1979, decedent's husband having died in the interim, and decedent was once again put on the medical assistance rolls.

On January 4, 1983, decedent's sister died leaving one-half of her estate to decedent. Decedent began to receive the proceeds of that inheritance in mid-April 1983, and she was again taken off the medical assistance rolls. She lived entirely off of these assets until her death on October 3, 1984.

Decedent left an estate of $130,148.26. Aside from some small bequests, Tucci is the sole beneficiary of the estate under decedent's will. Tucci is also the estate's personal representative. On January 4, 1985, the Ramsey County Human Services Department presented Tucci with a claim against decedent's estate for $63,630.69 pursuant to Minn.Stat. § 256B.15 (1984). This represents the total amount of medical assistance paid to decedent in 1977. Tucci denied the county's claim.

The probate court granted the county's petition for allowance of its claim, specifically holding that although Minn.Stat. § 256B.15 does create an age classification, the classification is not manifestly arbitrary and is rationally related to a legitimate governmental purpose. On appeal by the estate, the Court of Appeals affirmed and certified the issue to this court for accelerated review, 379 N.W.2d 563. See Minn.Stat. § 480A.10, subd. 2(b) (1984); Minn.R.Civ.App.P. 118, subd. 3.

At common law, a governmental unit that furnished some form of governmental assistance to an individual had no inherent authority to recover that assistance from the individual or the individual's estate. A legislature, however, may pass laws permitting the recapture of such funds. *See In re Settlement of Beaulieu*, 264 Minn. 406, 411, 119 N.W.2d 25, 29 (1963).

In 1967, the Minnesota Legislature passed an estate collection statute relative to the state's newly established medical assistance program. That collection statute reads:

If a person receives any medical assistance hereunder, on his death, if he is single, or on the death of the person and his surviving spouse, if he is married, and only at a time when he has no surviving child who is under 21 or is blind or totally disabled, the total amount paid for medical assistance rendered for the person, after age 65, without interest, shall be filed as a claim against the estate of the person in the court having jurisdiction to probate the estate. The claim shall be considered an expense of the last illness of the decedent for the purpose of section 524.3–805. Any statute of limitations that purports to limit any county agency or the state agency, or both, to recover for medical assistance granted hereunder shall not apply to any claim made hereunder for reimbursement for any medical assistance granted hereunder. Counties may retain one-half of the nonfederal share of medical assistance collections from estates that are directly attributable to county effort.

Minn.Stat. § 256B.15 (1984). This provision, as well as all of Minnesota's medical assistance provisions, was passed in accordance with Congress' 1965 amendments to the Social Security Act, which created the federal Medicaid program. *See* Social Security Amendments of 1965, Pub.L. No. 89–97, §§ 1902–1905, 79 Stat. 286, 343–52 (1965). Under these amendments, the federal medical assistance program was expanded to include individuals who are blind or permanently disabled, and families with dependent children in addition to the elderly. *Id.* §§ 1902(a)(10), 1905(a) (1965), 79 Stat. at 345, 351–52.

The statutory scheme created by Congress provides medical assistance appropriations to states that comply with the re-

quirements of 42 U.S.C. § 1396a (1983) referring to state plans for medical assistance. Any state receiving such funds that changes its medical assistance plan such that there is a failure by the state to comply with any provision in the statute may have federal funding cut off. 42 U.S.C. § 1396c (1983). One of those provisions relates directly to recapture of medical assistance funds from a former recipient's estate. 42 U.S.C. § 1396p (1983). That statute provides in part:

(1) No adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan may be made, except—

\* \* \* \* \* \*

(B) in the case of any other individual who was 65 years of age or older when he received such assistance, from his estate.

(2) Any adjustment or recovery under paragraph (1) may be made only after the death of the individual's surviving spouse, if any, and only at a time—

(A) when he has no surviving child who is under age 21, or \* \* \* is blind or permanently and totally disabled. \* \* \*

42 U.S.C. § 1396p(b) (1983).[1] Any state which does not comply with this provision may lose its federal medical assistance funding. 42 U.S.C. § 1396a(a)(18) (1983); 42 U.S.C. § 1396c (1983).

Amelia Turner's estate contends that Minn.Stat. § 256B.15 (1984) is unconstitutional in that it denies equal protection of the law to individuals who receive medical assistance after age 65. The estate argues that there exists no rational basis for distinguishing between medical assistance recipients who are over the age of 65 and those who are under the age of 65.

Any challenge to a statute on constitutional grounds raises familiar rules of construction. Minnesota law is clear that there exists a presumption in favor of the constitutionality of a statute and that a party challenging a statute on constitutional grounds must prove beyond a reasonable

doubt that the statute violates some constitutional provision. E.g., McGuire v. C & L Restaurant, Inc., 346 N.W.2d 605, 611 (Minn.1984). This court has repeatedly indicated that it exercises its power to declare a statute unconstitutional only when absolutely necessary and with extreme caution. E.g., Schwartz v. Talmo, 295 Minn. 356, 363, 205 N.W.2d 318, 323, appeal dismissed, 414 U.S. 803, 94 S.Ct. 130, 38 L.Ed.2d 39 (1973).

The equal protection clauses of the United States and Minnesota Constitutions direct that all persons similarly circumstanced shall be treated alike. See Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). It is, however, only "invidious discrimination" which offends the constitution. Ferguson v. Skrupa, 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1983). Accordingly, unless legislation involves what the courts refer to as a suspect classification or a fundamental right, see City of Cleburne v. Cleburne Living Center, — U.S. —, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985), a constitutional challenge to it is subject to review under the familiar rational basis standard. It is well settled that legislative classifications based upon age are not suspect classifications, Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976); Essling v. Markman, 335 N.W.2d 237, 239 (Minn. 1983), and that no person has a fundamental right to receive public assistance, Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1971). Therefore, in the case at bar, the challenged legislation must be "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Cleburne, 105 S.Ct. at 3254.

In determining whether a challenged classification is rationally related to achievement of a legitimate governmental purpose, we must answer two questions: "(1) [d]oes the challenged legislation have a legitimate purpose? and (2) [w]as it rea-

---

1. Before 1982, this section was numbered § 1396a(a)(18).

sonable for the lawmakers to believe that use of the challenged classification would promote that purpose?" *Western & Southern Life Insurance Co. v. State Board of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981); *Bernthal v. City of St. Paul,* 376 N.W.2d 422, 425 (Minn.1985).[2]

There is no real question that the statute at issue separates medical assistance recipients into two groups. But as noted by the Court of Appeals, these groups differ in at least one important respect:

> To qualify for medical assistance, a person under 65 must be totally disabled, blind or eligible for a specified public assistance program. With the last category an individual applying for medical assistance must first meet the income and assets standards of the particular program. After this initial determination has been made the applicant must then qualify separately for medical assistance, meeting the same residency and financial requirements a person over 65 must meet. In contrast, a recipient who is over 65 may qualify for medical assistance without falling into one of the specified categories.

*In re Estate of Turner,* 379 N.W.2d 563, 566 (Minn.App.1985).

New York has a medical assistance collection statute which is substantively equivalent to Minnesota's. N.Y.Soc.Serv.Law § 369, subd. 1(b) (McKinney 1983). The New York Court of Appeals found the statute to be rationally related to a legitimate governmental purpose and thus upheld the constitutionality of the statute. *Estate of Davis,* 57 N.Y.2d 382, 442 N.E.2d 1227, 456 N.Y.S.2d 716 (1982). In so holding, the court noted that the real parties in interest were not the medical assistance recipients, since no claim could be made against them during their lifetimes. The actual interest-

ed parties are the disappointed nondependent devisees, legatees, and heirs of the estate. *Id.* 57 N.Y.2d at 388, 442 N.E.2d at 1229, 456 N.Y.S.2d at 718. The court went on to state that even ignoring this "insulation" there is a rational basis to the distinctions made. The court reasoned:

> [T]o qualify for Medicaid a person under 65 must be totally and permanently disabled, suffer a catastrophic illness, be blind or in a public assistance status. In contrast, a recipient who is over 65 may qualify for Medicaid without falling into one of those categories. It seems obvious that this relaxation of eligibility requirements is designed to make it possible for those over 65 in any event to keep their homes and other specified assets when stricken with illness late in life. * * Needless to say, this also tends to enhance personal dignity. To, in turn, exact an obligation of repayment only after death, and then only when no dependent survivor is likely to exist, is hardly disproportionate to these circumstances vis-a-vis those which attend Medicaid eligibility for all those under 65.

*Id.* at 388, 442 N.E.2d at 1230, 456 N.Y.S.2d at 719 (citation omitted).

We agree with this analysis. The estate collection statute at issue here serves a very important purpose. It is a system whereby money paid to qualified individuals for health care purposes may be recovered and reused to help other similarly situated persons. The statute contains specific safeguards to ensure that surviving spouses and dependents are not deprived of their interests in the former recipients' estates. In short, the statutory scheme of Minn.Stat. § 256B.15 takes that path of least resistance toward the achievement of not only a legitimate state purpose, but a very important state purpose as well. The classification of recipients into two groups,

---

**2.** In reference to the rational basis test, we note that in the past we have on occasion worded the test differently. *See, e.g., Bituminous Casualty Corp. v. Swanson,* 341 N.W.2d 285, 287 (Minn. 1983); *Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979). These cases, however, merely represent different ways of stating the same analysis. We reiterate here that the rational basis standard used in Minnesota equal protection analysis is the same as the standard used in federal equal protection analysis. *E.g., AFSCME Councils 6, 14, 65 and 96 v. Sundquist,* 338 N.W.2d 560, 569 n. 11 (Minn.1983); *State v. Forge,* 262 N.W.2d 341, 347 n. 23 (Minn.1977).

*i.e.,* those over 65 years old and those younger than 65, does have a rational basis.

Decedent's estate also made a motion to this court to strike a portion of the appendix to the brief of the intervenor, State of Minnesota, and for attorney fees in connection with the motion. The challenged materials refer to a statistical report on Minnesota medical assistance which was not part of the record at either the trial or appellate court levels. The report, however, consists only of general information concerning Minnesota's medical assistance program and is a matter of public record. The annual report is required by the Health Care Financing Administration, United States Department of Health and Human Services. On an issue of such magnitude, we see no reason why a party may not submit such a report to us as part of its brief when we could refer to such a report in the course of our own research, if we were so inclined. Accordingly, the estate's motions to strike that portion of the intervenor's appendix and for attorney fees is denied.

Affirmed.

WAHL, Justice, concurring specially.

I agree that Minnesota Statute § 256B.15 (1984) would pass muster under both Minnesota and federal constitutional standards. I am concerned, however, that footnote 2 in the majority opinion perpetuates confusion and continues a "battle of footnotes" as to whether the rational basis standard under Minnesota law is identical to the federal rational basis standard. By footnote in a 1981 opinion, *Wegan v. Village of Lexington,* 309 N.W.2d 273, 281 n. 14 (Minn.1981), we indicated the rational basis standard under the Minnesota constitution differed from the federal standard. By footnote in 1982, in *AFSCME Councils 6, 14, 65 & 96 v. Sundquist,* 338 N.W.2d 560, 570 n. 12 (Minn.1983), we stated that the federal and Minnesota state standards were "coextensive." By footnote in 1984, in *McGuire v. C & L Restaurant, Inc.,* 346 N.W.2d 605, 613 n. 10 (Minn.1984), we

again declared that the state and federal standards are different. In today's opinion we shift our position with still another footnote. The result is that the legal community is left not knowing which statement of the relationship between the state and federal rational basis standards, if any, is to be given precedential value.

To say that the wording of the rational basis test in Minnesota case law merely represents a different way of stating an identical federal test, in my view, distorts and minimizes significant distinctions in the manner in which Minnesota cases have applied rational basis analysis. The differences between the two tests as they have been applied are more than semantic differences.

The federal rational basis test demands: (1) a legitimate purpose for the challenged legislation; and (2) that it was reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose. *Western & Southern Life Insurance Co. v. State Board of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981). The Minnesota rational basis test requires: (1) a genuine and substantial distinction between those inside and outside the challenged class; (2) a connection between the distinctive needs of the class and the statutory remedy; and (3) a legitimate purpose for the statute at issue. *Guilliams v. Commissioner of Revenue,* 299 N.W.2d 138, 142 (Minn.1980).

Review under the federal test traditionally gives great deference to the lawmaker. It is not required that the challenged law be wise or provident, *see, Williamson v. Lee Optical Co.,* 348 U.S. 483, 484–86, 75 S.Ct. 461, 462–63, 99 L.Ed. 563 (1955), nor that the evidence relied on by the lawmakers be empirically correct, *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 463–64, 101 S.Ct. 715, 723–24, 66 L.Ed.2d 659 (1980), *rehearing denied,* 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981), nor that the objective asserted for the law in fact formed the basis of the legislative decision. *United States Railroad Retire-*

*ment Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). A classification has been upheld "if any state of facts reasonably can be conceived that would sustain it." *Allied Stores v. Bowers,* 358 U.S. 522, 528, 79 S.Ct. 437, 441, 3 L.Ed.2d 480 (1959). In other words, if the lawmakers or the reviewing court can hypothesize some conceivable relationship between the challenged classification and the legitimate state purpose behind the law, it will be hpheld. *See Clover Leaf Creamery,* 449 U.S. at 463–64, 101 S.Ct. at 723–24.

By contrast, while this court has not written at length explaining what is required by Minnesota rational basis analysis, our cases applying rational basis review demonstrate that ours is a more substantive review than that under the federal constitution. A commentator who has carefully examined our cases applying this analysis has shown that this court is unwilling to hypothesize a rational basis to justify a classification, as the most deferential standard of review mandates, but instead closely scrutinizes the asserted justification for a challenged classification. This commentator concludes that we have demanded a reasonable connection be shown between the actual, and not just

theoretical, effect of the challenged classification and the statutory goals. Deborah McKnight, *Minnesota Rational Relation Test: The Lochner Monster in the 10,000 Lakes,* 10 Wm. Mitchell L.Rev. 709, 726 (1984), analyzing the cases of *Wegan, supra.,* 309 N.W.2d 213 (Minn.1981); *Nelson v. Peterson,* 313 N.W.2d 580 (Minn.1981); and *Thompson v. Estate of Petroff,* 319 N.W.2d 400 (Minn.1982).

We should recognize that a difference exists between the federal and the Minnesota rational basis analysis, and consider whether we wish to continue to articulate and apply an independent Minnesota constitutional standard of rational basis review. In my view we should.[1]

In the first place, we would have difficulty following the federal standard even if we wished to do so. It is unclear what level of scrutiny the federal rational basis standard actually represents. While the language of the opinions of the United States Supreme Court emphasizes that rational basis is an extremely deferential standard of review, the Court has, on occasion, invalidated legislation as irrational by analyses that depart from deference and appear to constitute much more substantive levels of review.[2] Secondly, even if

---

1. There is no impediment to this court explicitly adopting a stricter standard of equal protection review under our state constitution. *Clover Leaf Creamery,* 449 U.S. at 461, 101 S.Ct. at 722.

2. The decision in the case of *City of Cleburne v. Cleburne Living Center,* — U.S. —, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), for example, is only the most recent example of this phenomenon and creates substantial uncertainty about the intensity of review embodied in the federal rational basis standard. In *Cleburne,* the Court held that laws treating mentally retarded persons differently from other persons would be reviewed by the rational basis standard. *Id.* 105 S.Ct. at 3255–58. The Court then overturned as irrational the application of a municipal zoning ordinance that required a special use permit for the establishment of homes for the mentally retarded, but not for other care or multiple dwelling facilities. *Id.* 105 S.Ct. at 3259. The City Council had denied a special use permit to the Cleburne Living Center, who sought to establish a group home for mentally retarded men and women. In defending the zoning ordinance, the City presented numerous arguments

justifying special treatment of facilities for the mentally retarded that should have satisfied the "any conceivable basis" standard of review. The Court responded to these arguments by closely scrutinizing the facts in the legislative record and by challenging the City's reasoning. The Court in *Cleburne* disputed the empirical bases of the lawmakers' judgment, questioned their objectives, and inquired into the actual, and not just the theoretical, effect of the challenged ordinance. The Court concluded the City had no rational basis for believing a group home would pose a special threat, but instead had required a special use permit out of irrational prejudice against the mentally retarded. *Id.* 105 S.Ct. at 3259.

The vigor of the Court's analysis in *Cleburne,* as well as the result of the case, indicates the Court applied a more substantive standard of review under the guise of the traditional federal rational basis test. The existence of this unarticulated heightened standard was pointed out by Justice Marshall in dissent, who terms the majority's analysis "intermediate review * * * masquerading in rational basis language." *Id.* at 3265, n. 4 (Marshall, J., dissenting). A discus-

the federal standard were firmly established at this time, I would question whether we should harness interpretation of our state constitutional guarantees of equal protection to federal standards and shift the meaning of Minnesota's constitution every time federal case law changes.[3] Such a result would undermine the integrity and independence of our state constitution and degrade the special role of this court, as the highest court of a sovereign state, to respond to the needs of Minnesota citizens. This court's increasing use of a more substantive standard of rational basis review is, in my view, a healthy trend towards realism and responsibility. By undertaking a serious and genuine judicial inquiry into the correspondence between the means to a statutory goal and the goal itself, I believe we have properly decided that our constitutional function of providing protection against arbitrary and unreasonable discrimination in our state's laws should be governed by realistic, not strained or wholly fictional analyses. Those defending a statute should bear the burden of factually demonstrating a relation between the classification and the legislative purpose. There should be no judicial deference based on imaginable supporting facts or conceivable legislative purposes that are totally unrealistic.[4] To insist on engaging in judicial review in the real world rather than in never-never land is not to impermissibly substitute our own values and policy judgments for those of the legislature but to move toward realism and protection of constitutional rights, this court's proper function.

sion of the Court's history of applying a heightened standard of review in cases where its express rationale calls for rational basis review is *Comment, Rational Basis Review Under the Equal Protection Clause—A Double Standard Review—City of Cleburne, Texas v. Cleburne Living Center,* 55 Miss.L.J. 329 (1986).

3. Scholars disagree as to the wisdom of tying a state court's interpretation of a state constitutional requirement of equal protection to the United States Supreme Court's interpretation of what is required by a similar provision in the federal constitution. *Compare, e.g.,* McKnight, *supra.,* (favoring federal-state uniformity) and

Kirby, *Expansive Judicial Review of Economic Regulation Under State Constitutions: The Case for Realism,* 48 Tenn.L.Rev. 241 (1981) (favoring independent, more substantive state standards).

4. This "realistic" approach to rational basis review is supported by respected commentators, such as Gerald Gunther, *see Forward to the Supreme Court, 1971 Term,* 86 Harv.L.Rev. 1, 21 (1972), and by the supreme courts of other states, including California and Alaska. *See, e.g., Isakson v. Rickey,* 550 P.2d 359 (Ala.1976); *Brown v. Merlo,* 8 Cal.3d 855, 506 P.2d 212, 106 Cal.Rptr. 388 (1973).