**Buddie GREENE, petitioner, Appellant,**

v.

**COMMISSIONER OF the MINNESO-TA DEPARTMENT OF HUMAN SERVICES, Respondent,**

**Aitkin County Health and Human Services, Respondent.**

No. A06–804.

Court of Appeals of Minnesota.

June 19, 2007.

Frank W. Bibeau, Anishinabe Legal Services, Cass Lake, MN, for appellant.

Lori Swanson, Attorney General, Margaret H. Chutich, Assistant Attorney General, St. Paul, MN, for respondent Commissioner of Department of Human Services.

James P. Ratz, Aitkin County Attorney, Aitkin, MN, for respondent Aitkin County Health and Human Services.

Considered and decided by RANDALL, Presiding Judge, WILLIS, Judge, and CRIPPEN, Judge.

## OPINION

CRIPPEN, Judge.*

Appellant Buddie Green is a member of the Minnesota Chippewa Tribe (MCT), which provides employment service to its members pursuant to an agreement, permitted by statute, in which MCT and the State of Minnesota arrange for services to recipients under The Minnesota Family Investment Program (MFIP), a public assistance plan for low-income families with children. Appellant contends that without her freedom for access to an Aitkin County employment service, serving non-members of MCT, she is denied equal protection of the laws. Because the channeling of appellant's right of access to her tribal service occurs as part of her tribe's contractual arrangement for the benefit of its members, it is political rather than racial in nature, and appellant fails to show a loss of her constitutional rights. We affirm, as did the district court, the commissioner's decision upholding a county-imposed, partial suspension of appellant's MFIP benefits based on her failure to participate in employment services.

## FACTS

This appeal stems from an amended order of the Commissioner of Human Services upholding a sanction imposed by Aitkin County that partially suspended the Minnesota Family Investment Program (MFIP) benefits received by appellant Buddie Greene. The MFIP, codified in chapter 256J of the Minnesota statutes, is a state welfare reform program for low-income families with children. The program helps families by providing cash and food assistance. Pursuant to Minn.Stat. § 256J.09, subd. 1 (2006), an individual may seek assistance from the MFIP by applying for benefits through the county social service agency in the county where the person lives. After eligibility is established, Minn.Stat. § 256J.46, subd. 1 (2006), mandates that MFIP program participants comply with ongoing program requirements, one of them calling for participation in employment and training services. Program participants who fail to

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

comply with employment services may be sanctioned and lose MFIP benefits under Minn.Stat. § 256J.46, subd. 1, absent a showing of good cause under section 256J.57.

Minn.Stat. § 256J.645 (2006), provides the commissioner with the authority to enter into agreements with federally recognized Indian tribes whereby the tribe provides MFIP employment services to members of the tribe. Subdivision 3 of this statute dictates that Indian tribes opting to enter into such an agreement with the State of Minnesota directly receive state funding at the same levels and under the same conditions as counties that provide those services. Subdivision 4 provides that Indian tribe members "receiving MFIP benefits and residing in the service areas of an Indian tribe operating employment services under an agreement with the commissioner must be referred by county agencies in the service area to the Indian tribe for employment services."

The Minnesota Chippewa Tribe (MCT) and the commissioner entered into an agreement for fiscal year 2004/2005, wherein the MCT agreed to provide MFIP employment services for specific public assistance recipients who are of Indian descent. The language of the agreement is consistent with the statutory language set forth in chapter 256J; it provides in relevant part that the tribe "shall provide" MFIP employment services to those who are eligible for such services, receive MFIP benefits, reside within the "Tribal program area," and

> [t]he person is enrolled or eligible for enrollment in the [MCT]. The [MCT] consists of six reservations: Bois Forte, Fond du Lac, Grand Portage, White Earth, Leech Lake, and Mille Lacs Reservations. . . .

No provision in the agreement allows the MCT to refer eligible members to the county social service agency for the MFIP employment services.

The service delivery area for the MCT includes Aitkin County, and the service provider locations are Cass Lake, Duluth, Virginia, Cloquet, and Bemidji. Aitkin County residents are located from 70 to 100 miles from the nearest service center operated by the tribe, which appears to be the Cloquet office. Appellant alludes to this distance information, but she rests her claim solely on her freedom of choice, not an assertion of any disadvantage in dealing with the tribal service. Notably, the tribal office offers services to members located in Aitkin County, or any place distant from its primary office, by designating agents in those places to meet with members to deliver agency services.

At the time this dispute arose, appellant received MFIP benefits for herself and a minor child. On July 20, 2004, Aitkin County referred appellant to the MCT for employment services because appellant is an enrolled member of the MCT, was eligible to participate in the MFIP, and resided within the tribal MFIP service delivery area of Aitkin County. Appellant subsequently asked the MCT for a referral to a county employment service provider. The MCT declined the request, stating that it "is mandated to provide you service and cannot refer you elsewhere."

In December 2004, the MCT learned that appellant was non-compliant with employment requirements and, therefore, requested that Aitkin County impose a sanction under which appellant's MFIP benefits would be partially suspended. Appellant challenged the sanction and a hearing was held on the matter. At the hearing, appellant admitted that she did not attend the required employment service overview and that she did not develop an employment plan with the MCT. Appellant also failed to articulate any ex-

planation that might qualify for good cause to be excused from the requirements of Minnesota Statutes chapter 256J.

On March 31, 2005, the appeals referee recommended that appellant be allowed to access county employment services, but the commissioner's delegee notified the parties that the commissioner intended to adopt an order differing from the referee's recommendation. After soliciting and receiving comments from appellant and Aitkin County on a proposed amended order, the commissioner upheld the sanction, finding that "[a] person in appellant's circumstances must get employment services through the [MCT] even though Aitkin County pays her cash benefits under the [MFIP]. Appellant refused without good cause to do so, and the county agency imposed a reduction in cash payments as a sanction."

Appellant sought relief in the district court, arguing inter alia, that Minn.Stat. § 256J.645 violated her right to equal protection. The district court subsequently affirmed the sanctioning of appellant's MFIP benefits, concluding that the statute met the equal protection requirements under the state and federal constitutions.

## ISSUE

Is a public law for the benefit of a tribe unconstitutional because its members are not given the freedom to refuse an included tribal service and participate instead in a non-tribal service?

## ANALYSIS

■ The constitutionality of a statute is a question of law, which is reviewed de novo. *Granville v. Minneapolis Sch. Dist., Special Sch. Dist. No. 1,* 716 N.W.2d 387, 391 (Minn.App.2006), *review granted* (Minn. Sept. 19, 2006). Minnesota statutes are presumed to be constitutional, and the

power to declare a statute unconstitutional is "exercised with extreme caution and only when absolutely necessary." *In re Haggerty,* 448 N.W.2d 363, 364 (Minn. 1989). The party challenging the constitutionality of a Minnesota statute bears the burden of establishing beyond a reasonable doubt that the statute violates a constitutional provision. *Id.*

■ The Equal Protection Clause of the Fourteenth Amendment provides, in relevant part, "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The guarantee of equal protection of the laws requires that the state treat all similarly situated persons alike." *State v. Behl,* 564 N.W.2d 560, 568 (Minn.1997). "An essential element of an equal protection claim is that the persons claiming disparate treatment must be similarly situated to those to whom they compare themselves." *St. Cloud Police Relief Ass'n v. City of St. Cloud,* 555 N.W.2d 318, 320 (Minn.App. 1996), *review denied* (Minn. Jan. 7, 1997).

Minn.Stat. § 256J.645, subd. 4, provides that "Indian tribal members receiving MFIP benefits and residing in the service area of an Indian tribe operating employment services under an agreement with the commissioner must be referred by county agencies in the service area to the Indian tribe for employment services." As appellant asserts, even if section 256J.645, standing alone, survives an equal protection claim, the statute must be read together with the state's contract with the MCT. To support her claim, appellant points to the statutory language mandating that tribal members receiving MFIP benefits must be "referred" to the Indian tribe for employment services. *See* Minn. Stat. § 256J.645, subd. 4. The contract with the MCT provides that once individuals are referred to the tribe, the individu-

must use employment services provided by the tribe. Appellant asserts that non-Indians and members of other tribes are able to receive employment services through a county agency, while she is ineligible to receive these services. Thus, appellant argues that Minn.Stat. § 256J.645, violates the Equal Protection Clause of the United States Constitution.

■■■ There is no dispute that identified members of the MCT are treated differently under the statute; the dispute concerns the level of scrutiny to be applied. *See Erlandson v. Kiffmeyer,* 659 N.W.2d 724, 733 (Minn.2003) (stating that to determine whether a statute violates equal protection, this court first examines "whether the challenged classification must satisfy strict scrutiny or merely the rational basis standard."). This court applies strict scrutiny to legislatively created classifications in two situations: (1) when they impermissibly limit a fundamental right; or (2) when they involve a suspect classification. *Krueth v. Indep. Sch. Dist. No. 38,* 496 N.W.2d 829, 835 (Minn.App. 1993) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)), *review denied* (Minn. Apr. 20, 1993).[1] "Strict scrutiny requires the classifications to be necessary or narrowly tailored to a compelling governmental purpose." *Id.* When the classifications do not involve a suspect class or infringe upon a fundamental right, the legislation is subject to review under the rational basis standard. *See id.* Under this standard, if the classification is rationally related to a legitimate governmental purpose, it does not violate the equal protection clause. *In re Estate of Turner,* 391 N.W.2d 767, 769 (Minn.1986).

We agree with respondent that the issue is controlled by *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). In *Mancari,* non-Indian employees of the Bureau of Indian Affairs (BIA) brought a class action challenging employment preference for qualified Indians in the BIA provided by the Indian Reorganization Act. 417 U.S. at 538–39, 94 S.Ct. at 2477. The Supreme Court articulated that preferences for American Indians are not racial but political when the preferences apply to members of federally recognized tribes. *Id.* at 553 n. 24, 94 S.Ct. at 2484 n. 24. Thus, the Court held that "as long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 555, 94 S.Ct. at 2485.

This court in *Krueth* followed the reasoning set forth in *Mancari.* In *Krueth,* non-Indian tenured teachers appealed from a decision of the school district placing them on unrequested leave of absence while less senior American Indian teachers were retained pursuant to Minn.Stat. § 126.501 (1990) (the American Indian Education Act). 496 N.W.2d at 831–32. In addressing the non-Indian tenured teachers' equal protection claim, this court noted that *Mancari* found the American Indian classifications were not racial but political since they were limited to members of federally recognized tribes. *Id.* at 837. This court further noted that the "classification must be limited to members of federally recognized tribes, not just people of some American Indian ancestry, otherwise strict scrutiny would apply to limit state racial affirmative action preference." *Id.* But because the classification of federally recognized tribes is political

---

1. We note that appellant makes no assertion that her "freedom of choice" argument implicates a fundamental right. Rather, appellant focuses her argument on the statute's disparate treatment of members of the MCT.

rather than racial, the court determined that a rational basis test should be applied. *Id.*

Here, appellant's position is narrowly stated; that *Mancari* and *Krueth* are controlling law on the question of separate tribal-member benefits, but that it is quite different to limit the service agency choices of the members. This distinction is supported neither by any cited authority nor by any reason. The public has determined a benefit for the MCT, a tribal entity, in every respect in accord with its wishes, and this classification of administrative service programs does not become racial rather than political when member access is channeled to the tribal service program rather than the program provided for non-members. Although appellant's argument that the arrangement here does more harm than good is significant, we note that appellant asserts no special harm and no lack of tribal benefit. Thus, in accordance with *Mancari* and *Krueth,* we conclude that strict scrutiny is not required.

Under a rational basis standard of review, the statute passes constitutional muster. The statutory scheme was enacted to provide the MCT with a greater responsibility for self-government. This legislation enables federally recognized Indian tribes that so choose to contract with the commissioner, to develop and to provide employment services programs that fulfill the MFIP requirements for their tribal members who receive MFIP benefits. Thus, the statute allows tribes that seek such tribal responsibility to assume ongoing interactions with their own members to ensure that tribal members receive employment services in the best and most effective way possible. This supports the legitimate state interest of protecting and promoting tribal sovereignty. Minn.Stat.

§ 256J.645 does not violate the equal protection clause of the federal constitution.

Appellant also contends that Minn.Stat. § 256J.645, violates the equal protection clause of the Minnesota Constitution. This provision provides in relevant part that "[n]o member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." Minn. Const. art. I, § 2. Like the equal protection clause of the federal constitution, Article I, section 2 of the Minnesota Constitution begins with the mandate that all similarly situated individuals shall be treated alike, but only "invidious discrimination" is deemed constitutionally offensive. *Turner,* 391 N.W.2d at 769 (Minn.1986) (quoting *Ferguson v. Skrupa,* 372 U.S. 726, 732, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963)). But the Minnesota Constitution can be interpreted "to afford greater protections of individual civil and political rights than does the federal constitution." *Kahn v. Griffin,* 701 N.W.2d 815, 828 (Minn.2005).

Appellant argues that because Minnesota does not have the federal government's unique obligation toward federally recognized Indian tribes, Minn.Stat. § 256J.645 violates the State of Minnesota's equal protection clause by disparately treating members of the MCT. To support her claim, appellant relies on *Malabed v. North Slope Borough,* 70 P.3d 416 (Alaska 2003). In that case, the Alaska Supreme Court held that a borough's Native American hiring preference violated the Alaska Constitution's guarantee of equal protection because the borough lacked a legitimate governmental interests to enact a hiring preference favoring one class of citizens at the expense of others. *Malabed,* 70 P.3d at 427–28. But *Malabed* concerned a borough's ordinance. In contrast, the challenged law here concerns

state law. In declaring the borough's ordinance unconstitutional, the Alaska Supreme Court stated that "we [do not] suggest that all state or local legislation pertaining to Alaska Natives or tribal governments should be assumed to establish suspect classifications presumptively barred by equal protection." *Id.* at 426. The court noted that "[t]o the contrary, we think that the state has considerable latitude in dealing with recognized tribes as to matters of intersecting governmental concern when the state's actions rationally promote legitimate mutual governmental or proprietary interest." *Id.* at 427 n. 51.

 Here, the purpose of Minn. Stat. § 256J.645 is to further the MCT's ability to govern its members and provide tribal members with appropriate services. Although it is the federal government that has a "unique" obligation to American Indians, this "unique obligation," characterized as the "trust doctrine," also applies to state action. *See Krueth,* 496 N.W.2d at 836. This court stated that "[s]tate action for the benefit of Indians can also fall under the trust doctrine and therefore be protected from challenge under the equal protection clause or civil rights statutes." *Id.* (quoting *St. Paul Intertribal Housing Bd. v. Reynolds,* 564 F.Supp. 1408, 1412 (D.Minn.1983)). Because the statutory purpose of Minn.Stat. § 256J.645 is to further the MCT's self-governance of tribal members for the benefit of its members, the classifications are political rather than race based, a rational basis standard is applicable, and no different result from the federal constitution is mandated by our state constitution.

## DECISION

Because the classifications under Minn. Stat. § 256J.645, subd. 4, are political rather than racial, a rational basis standard of review is applicable. The statute passes constitutional muster by supporting the legitimate state interest of protecting and promoting tribal sovereignty. Minn.Stat. § 256J.645, subd. 4, does not violate the equal protection clause of the federal or state constitutions.

**Affirmed.**

RANDALL, Judge (dissenting).

I respectfully dissent. Appellant Buddie Greene is in all respects an American citizen, a resident of Aitkin County, Minnesota and a citizen of the State of Minnesota. She is part Native American and has enough blood quantum to be enrolled in the Minnesota Chippewa Tribe. Her home reservation is Leech Lake. She does not live on the reservation but rather lives in Aitkin. As the majority sets out, there is a voluntary agreement between the Minnesota Department of Human Services and the Minnesota Chippewa Tribe (MCT) whereby the Minnesota Department of Human Services agrees to provide the Minnesota Family Investment Program (MFIP) to enrolled members of six northern Minnesota Ojibwe reservations (there are seven Ojibwe reservations in northern Minnesota; Red Lake is not a member if the MCT and is not a signatory to this agreement).

MFIP is a public assistance plan for low income families with children and is not restricted to Minnesota Native Americans nor does it discriminate against Minnesota Native Americans. It is simply open to Minnesota families qualified by residence and low income levels.

There is nothing in the MFIP regarding being race-based. If there were, I suspect the politically correct among us, lay people and politicians, would elbow each other off the pulpit and decry such a shameful thing. Nor do you have to belong to the MCT, even if you are a Native American,

to receive services that you otherwise qualify for. For instance, you might be an Ojibwe but not enrolled in any of the signatory tribes. You might be a Native American member of any of the other numerous tribes not enrolled in the MCT. Your right to receive MFIP services from Aitkin County would simply turn on your county residence and the income level of you and your children.

The agreement is an idea of the Minnesota Department of Human Services and the MCT. That agreement is not mandated by the Bureau of Indian Affairs or the federal government or any Minnesota state statute that I know of.

Appellant simply wants to qualify for the MFIP services as a bona fide member of Aitkin County, Minnesota and to avail herself of the same rights that any resident of Aitkin County has. She does not wish to go through the MCT. For refusing to go through the MCT, she was denied benefits she was otherwise entitled to receive, to help to raise her child. The first hearing was before an administrative referee who found in appellant's favor, and held that while she could apply through the MCT, she did not have to as she was otherwise eligible. Specifically, Referee Moore stated:

> While the statute imposes a duty upon the country to make referrals to tribal employment services when a participant is deemed eligible, there is no requirement that an eligible participant utilize that service simply because they are eligible. Likewise, the fact that the tribal employment services programs cannot refuse to provide eligible participants services, does not in turn create a requirement that an eligible participant utilize those services. The appellant, like any other citizen of Aitkin County, should be able to access county employment services.

Referee Moore was correct. I agree with Referee Moore and appellant's attorney who argues that the law requires a referral but does not strip applicants like appellant of their rights as a county resident if they wish to forgo their tribal preferences and deal directly with the county.

As appellant argues, Minn.Stat. § 256J.645, subd. 4 (2006), states that "Indian tribal members receiving MFIP benefits and residing in the Service area of an Indian tribe operating employment services under an agreement with the commissioner must be referred by county agencies in the service area to the Indian tribe for employment services." There is a mandatory "referral" but there is no statement that ineligible enrollees become ineligible if they participate directly with the county of their residence.

The goal of allowing Indian tribes to help their enrolled members is accomplished by this mandatory referral. The majority of eligible Native Americans make use of that preference. The goal of helping tribes help their members cannot subvert the right of a Minnesota citizen to pass up a race-based preference and simply deal with their county and their state on the basis of "I'm an independent human being and a resident and this service is open to me." For instance, there are affirmative type scholarships and grants available to those who are in need and belong to a particular racial/ethnic background. But *they are not excluded* from applying for, and competing for "colorblind" scholarships and grants based exclusively on need and their academic or athletic prowess. National Merit Scholarships are open to all, while at the same time there may be scholarships available for black, Hispanic, and Native American children that are not open to Caucasians. You can have dual applications if you want. What we do not

have is a law that says minority students cannot apply for the same state access and benefits that Caucasian students can apply for, but rather are restricted to racial/ethnic avenues. Yet respondents argue that is so for appellant. Respondents' briefs argue the proposition that appellant is restricted to her "tribal track" and is barred from applying directly to the county of her residence.

Respondents in this case, never mention and never come near *Brown v. Bd. of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). You see, what we have here are respondents pushing for "separate but equal" treatment for enrolled members of MCT, and the majority reiterating "separate but equal" under the guise of "helping" tribes help their members. Appellant Buddie Greene wishes to be treated as a citizen of Minnesota and the United States. She wishes to forgo any preference she might have as a member of a Native American tribe. I suggest that neither Aitkin County nor the State of Minnesota can forbid her to do that.

In *Morton v. Mancari*, the Supreme Court conveniently sidestepped its reasoning in *Brown*. 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). In upholding a federal law that provided a preference for qualified Indians, the Court held that favoring American Indians is not race-based, but "political." *Id.* at 553 n. 24, 94 S.Ct. at 2484 n. 24. The illogic is inescapable.

As I have previously noted:

If that were the case, those in Congress who were bitterly opposed to *Brown v. Board of Education* would have thought of the simple expedient of calling black Americans a political class, rather than a race-based class, and merrily continued on their way with de facto segregation.

If this country is to meaningfully deal with the consuming problem of race and race bias, we have to be smarter than that; we have to be more honest than that.

*Cohen v. Little Six, Inc.*, 543 N.W.2d 376, 402 (Minn.App.1996) (Randall, J., dissenting), *affirmed* 561 N.W.2d 889 (Minn. 1997).[2]

Since 1924, the Indians of our state have been, and continue to be, Minnesotans and U.S. citizens under the laws of this country. Yet, even with the Supreme Court's strong denunciation of government action that places distinctions on disparate classes of citizens, we carry on with the notion of separate but equal for MCT Indians under the guise of preference.

As U.S. citizens, Indians enjoy the same guarantees of citizenship as their fellow Americans. In recognizing appellant Buddie Greene as a tribal member, instead of an American citizen and a county resident, we ignore her ability and right to make choices available to all citizens.

A tribe is not a living, breathing person endowed with the protection of the United States Constitution, its Bill of Rights, and the Minnesota Constitution. The tribe is a governmental entity like Hennepin or Ramsey County, or Aitkin County, or the City of Aitkin. Municipalities are not the individuals protected by the constitution. The *residents* of those municipalities are.

Minnesota's eleven Indian tribes, seven Ojibwe and four Dakota Sioux, are municipal governments. Many tend to be incorporated, including some in Delaware. If you want to call "the tribe" a political class, that would be in keeping with calling Hennepin County or Ramsey County a

---

**2.** As I have previously acknowledged, I cited *Mancari* in reaching the result in *Krueth*. Although I still conclude that the result reached

in *Krueth* was just and equitable, I no longer subscribe to the reasoning behind the decision.

political entity/political class. No harm is done to the language by so doing. But, the residents of Hennepin and Ramsey County are not a political entity or a political class. They are human beings divided by long recognized divisions of race and ethnic origin. The same is true for enrolled Indian people. You can say they are members of a municipal-like government and that that government is a political entity; but the individual members are, like residents of Hennepin and Ramsey County, human being with racial/ethnic origins and they have the rights, as all citizens, not to be boxed into a separate but equal track.

In an oral argument, the attorney for the State of Minnesota Department of Human Services, with candor (but probably not intentional) exactly stated respondents' reliance on "separate but equal." The precise argument was that the MCT and the Leech Lake Band had an infrastructure in place, and government jobs and people working in place, whose jobs consisted of handling the referrals from Aitkin County for MFIP services. If people like appellant were given the option of dealing directly with her county of residence and if enough people chose to do so, "there would not be enough economic activity to justify the tribe's infrastructure and some people might have to be laid off"! This argument was advanced by respondents with a certain amount of indignation. That happens to be what happened after the *Brown* decision. Many segregated, all black schools closed in time, and when the students were assimilated in one school or the other, not all the previously paid teachers, vice-principals, principals, and superintendents automatically got new jobs in the new integrated system. Right today, in towns in Minnesota with declining enrollment, people moving out of town are exercising Minnesota's long standing principle of school choice and, therefore, cutting a certain amount of teaching jobs.

If respondents are honest, and not hypocritical, they would have to make this argument if enough Indian children exercised their right to go to local public grade schools and high schools. Many Indian parents take advantage of this option. It is common on the reservations when the reservation grade or high schools are not comparable to the quality of local public schools. Respondents always have the option of using their own tribal schools if they have them, or using their local school district's public grade schools and high schools. On those reservations where the quality of the public school is thought by parents to be comparable to the local public school district, many parents keep their children in the reservation school. Even then, some parents exercise their right to use the local school district. Minnesota has certified grade schools and high schools (even some Head Start and kindergartens) for reservation members. *But it is always an option and a free choice.* If too many Indian parents chose local public schools for their children, then the local reservation schools would have to lay off teachers, administrators, janitors and superintendents. That will happen. Respondents will be there in the other corner trying to make an arrangement *to force* (as here) residents of tribes to go to reservation schools. That is, if they are honest, and not hypocritical. I suspect they would lose that case as they should lose this one.

*Brown v. Bd. of Educ.* centered on an all black school. There was not an accompanying hue and cry about all Hispanic schools, all Asian schools, or all Native American schools. But no one has seriously challenged assimilation with the narrow argument that *Brown* forbids de facto segregation against blacks, and since it did not specifically mention Hispanics, Asians,

and Native Americans, that must have been an intentional oversight, and, therefore, those racial/ethnic groups can continue to be forced into separate public schools and public welfare as long as schools and welfare are "bless my soul!"—equal.

Identified members of MCT are treated differently under the statute. The majority ducks strict scrutiny and goes along with the shibboleth that "Indian" is a political classification, not racial. Democrat and Republican are political classes! Caucasian, Black, Asian, Native American and Hispanic are racial/ethnic. As Casey Stengel said, "You can look it up!" Take a look at the next census from the United States of America and the racial/ethnic boxes of which you are asked to check. Caucasian, Black, Asian, Pacific Rim, American Indian, Alaskan Indian, Hispanic, etc. will all have boxes. "Democrat" and "Republican" will not have little boxes to check. They are political classifications, not racial or ethnic.

All 652 federally recognized tribes work off of blood quantum. Blood quantum is not "political." Blood quantum is racial. The most commonly used benchmark for enrollment is 25%. Tribes are free to increase or decrease that percentage for their own standards of enrollment. Because of marriage outside the tribe, many tribes today, in danger of declining enrollment, utilize "NBQ." That means, "no blood quantum." It really does not mean "no blood quantum"; it is simply shorthand for eliminating the need for a specific percentage of blood quantum. The tribes, utilizing "no blood quantum", pick a time period back in history, and if you are a lineal descendant of any enrolled member at that time, you may be eligible to enroll. That means 1/8, 1/16, 1/32, or 1/64 could

count. That bears an eerie resemblance to an old Louisiana statute that one could be classified "Negro" and subjected that race to the Jim Crow laws of that day. *See* La.Rev.Stat. Ann. § 42:267 (1982) (repealed 1983). Until 1970, a Louisiana statute had embraced the one drop rule, defining a Negro as anyone with a "trace of black ancestry." *See Sunseri v. Cassagne,* 195 La. 19, 196 So. 7, 7 (1940). This law was challenged in court a number of times from the 1920s on, including an unsuccessful attempt in 1957 by boxer Ralph Dupas, who asked to be declared white so that a law banning "interracial sports" (since repealed) would not prevent him from boxing in the state. *State ex rel. Dupas v. City of New Orleans,* 240 La. 820, 125 So.2d 375, 376 (1960). In 1970 a lawsuit was brought on behalf of a child whose ancestry was allegedly only one two-hundred-fifty-sixth black, and the legislature revised its law. *See* La.Rev.Stat. Ann. § 42:267. The 1970 Louisiana statute defined a black as someone whose ancestry is more than one thirty-second black. *Id.* Adverse publicity about this law was widely disseminated during the Phipps trial in 1983, filed as *Jane Doe v. State of Louisiana. See* 479 So.2d 369 (La.App. 4 Cir.1985). However, the new statute in 1983 did not retroactively abolish the "traceable amount rule" (the one drop rule), as demonstrated by the outcomes when the Phipps decision was appealed to higher courts in 1985 and 1985.[3]

Blood quantum as a race-based idea, an ethnic-based idea, and the fight against it, as a justification to treat citizens differently, was the heart of *Brown v. Bd. of Educ.* and all the battles before *Brown* and all the fights for decades after *Brown.*

---

**3.** James Gill, *Lords of Misrule: Mardi Gras and the Politics of Race in New Orleans,* 217

(University Press of Mississippi 1997)

Put another way, we can recognize "preferences." Certain affirmative actions have passed all constitutional tests at the state and federal levels. Public policy states those with bona fide needs can be a foundation for preferences. Just being poor can become a valuable preference when competing for grants and scholarships with someone with similar grades but "no need." But the reverse of legitimate preferences for racial/ethnic groups is discrimination if they want to voluntarily forgo a preference and simply apply on the basis of need (as appellant here in Aitkin County), and are prevented from doing so, because of race, as respondents argue should be the case.

Appellant can say, "I know I could be an Indian and track down some preferential treatment, but I'm tired. I don't want to deal with tribal government for today. I just want to be a resident of Aitkin County and a citizen of the state of Minnesota and the United States of America."

I would like to state that not only is that the case, but under the compelling, unalterable, and not unclear mandate of *Brown v. Bd. of Educ.*, respondents' hydra-headed assault on the doctrine that separate but equal is inherently unconstitutional has to be recognized. Like Perseus and the Gorgon, if only through a mirror, it has to be slain. I dissent. I would have affirmed the administrative referee.